UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUAN SOLANO<br><br>    Plaintiff,<br><br>v.<br><br>THE CITY OF NEW YORK and DETECTIVE MICHAEL CORVI,<br>Individually and as a Member of the New York City Police Department,<br><br>    Defendants. | No. 23 Civ. 3285<br><br>**COMPLAINT**<br><br>Jury Trial Demanded |

Plaintiff JUAN SOLANO ("Plaintiff"), by his attorneys, BRUSTEIN LAW PLLC., complaining of the Defendants, respectfully alleges, upon information and belief, as follows:

## NATURE OF ACTION

1. This is a civil action, pursuant to 42 U.S.C. §1983 and 1988, and state law, seeking monetary damages for Plaintiff, JUAN SOLANO, due to his wrongful arrest, prosecution, conviction, and imprisonment for a crime that he did not commit. Plaintiff's injuries were caused by the misconduct of NYPD Detective Michael Corvi.

2. Plaintiff spent approximately 2.5 years in local and state custody, before and after his trial and conviction, until his conviction was vacated and the charges were ultimately dismissed.

## JURISDICTION, VENUE, and CONDITIONS PRECEDENT

3. This action arises under 42 U.S.C. §§ 1983 and 1988, and under the common law of the State of New York.

4. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343, and by

principles of pendent jurisdiction.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## THE PARTIES

6.      Plaintiff JUAN SOLANO ("Plaintiff" or "Mr. Solano") is a citizen of the United States, and resides within the State of New York.

7.      Defendant THE CITY OF NEW YORK ("City"), of which the County of Kings is a subdivision, is a municipal corporation of the State of New York and is a resident of the Southern District of New York. The NYPD is an agency of Defendant THE CITY OF NEW YORK.  Detectives and police officers employed by the NYPD are agents and employees of Defendant THE CITY OF NEW YORK, which is legally responsible for torts they commit within the scope of their employment and/or under color of law.

8.      Defendant MICHAEL CORVI, was at all relevant times a detective employed by the NYPD, acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of New York and THE CITY OF NEW YORK, and acted within the scope of his employment.  He is sued in his individual and his official capacities.

## FACTUAL ALLEGATIONS

9.      Mr. Solano, a 50-year-old Hispanic male, has worked as a truck driver for decades (how many decades?).

10.     Mr. Solano was regularly hired to pick up sealed containers at one location, and without opening the containers or inspecting their contents, transport the containers to another location.

11.     Mr. Solano's job as a truck driver did not require him to know the contents of the containers he was transporting, only to insure that the containers got to the delivery location in

the same condition that he found them.

12. As part of his job, Mr. Solano regularly picked up sealed containers at marine terminals in New York City and transported them to local warehouses.

13. Mr. Solano drove over 250 containers per year and thousands of containers over his professional career.

14. Most of Mr. Solano's deliveries were from marine terminals in the New York City area to warehouses in the Hunts Point section of the Bronx.

15. In May 2016, Mr. Solano handled 23 different containers from either the Red Hook terminal or the Global Container Terminal in Staten Island on 18 of a possible 21 workdays. (what does this mean)

16. On two of the thousands of occasions that Mr. Solano had previously transported containers, law enforcement officers had found drugs concealed in the containers that Mr. Solano would later transport.

17. On both occasions, Mr. Solano agreed to answer the officers' questions and the officers had agreed that Mr. Solano had been exploited as an unknowing courier.

18. In July 2014, Customs and Border Patrol Officers inspecting a container at the East Coast Warehouse in Elizabeth, New Jersey discovered cocaine concealed in the corrugation of carboard boxes of plantains.

19. The officers removed the cocaine, reloaded and resealed the container and conducted a controlled delivery.

20. Mr. Solano picked up the container and drove it to a warehouse in Wayne, New Jersey.

21. Homeland Security Investigation Officer Brian Dalrymple ("Officer Dalrymple") questioned Mr. Solano three times about his role in transporting the container three times.

22. Each time, Mr. Solano waived his Miranda Rights, answered all of Officer Dalrymple's questions and provided him with information, including the name of the broker who arranged the delivery.

23. Mr. Solano had not known that there had been cocaine in the container and Officer Dalrymple did not arrest him.

24. Officer Dalrymple gave Mr. Solano his phone number and told him to call him if he learned of anything illegal happening at a port.

25. In January 2016, Customs and Border Patrol Officers inspecting a container at the Red Hook terminal discovered cocaine and heroin hidden in the corrugation of cardboard boxes of malangas and ginger.

26. Again, the officers repackaged the container without the drugs and conducted a controlled delivery, putting the container under surveillance.

27. Mr. Solano retrieved the container and drove it to a warehouse in Linden, New Jersey, then to a truck yard in Jersey City, and finally to a warehouse in the Bronx.

28. Defendant Corvi questioned Mr. Solano two tines about this container. Both times, Mr. Solano agreed to answer all of Defendant Corvi's questions, including identifying the person who had arranged the delivery, and produced the delivery order.

29. When Mr. Solano was told that the container had contained drugs, Mr. Solano said that he did not know.

30. Again Mr. Solano was not arrested.

31. On June 1, 2016, Customs and Border Patrol officers conducted a cargo examination at the Red Hook Container Terminal in Brooklyn and discovered 13 kilograms of cocaine hidden inside a sealed container shipped from the Dominican Republic.

32. Customs and Border Patrol notified Homeland Security Investigations and placed an agricultural hold on the Container so that it would not be picked up while the inspection was ongoing.

33. Also inside that container were cardboard boxes of coconuts, peppers and sour oranges stacked on wooden pallets.

34. Customs and Border Patrol confiscated that cocaine and returned the contents of the Container, absent the drugs, to the Container.

35. The Container was then resealed.

36. On June 6, 2016, the agricultural hold was lifted and agents began surveillance.

37. On June 6, 2016, at approximately 8:30 a.m., Edwin Pacheco ("Pacheco"), the owner of 16 Brothers Trucking, attempted to retrieve the Container, but he was informed that the Container could not be released because there were unpaid fees.

38. On June 7, 2016, Mr. Solano had begun the day entering the Global Container Terminal at 7:01 a.m.

39. Mr. Solano retrieved a container of green plantains for Raices Latinas Produce, an importer.

40. Javier Montalvo, ("Mr. Montalvo") the administrative manager for Raices Latinas, had hired Mr. Solano to drive the container to the purchaser's warehouse in Hunts Point.

41. Mr. Montalvo and Mr. Solano had exchanged phone calls throughout the morning.

42.	Mr. Montalvo was at the warehouse when Mr. Solano arrived.

43.	Mr. Montalvo and Mr. Solano discussed the shipment.

44.	During the conversation, Mr. Machuca, an importer-exporter, called Mr. Solano and asked him to drive a different container, the Container at issue here, from the Red Hook terminal to Hunts Point.

45.	Mr. Machuca was not the owner of the container but was simply arranging the transport for the actual owner.

46.	Mr. Machuca had not known that the container had contained any drugs, and he never told Mr. Solano that the container had any drugs in it.

47.	Before asking Mr. Solano, Mr. Machuca had asked Mr. Pacheco who had attempted to retrieve the container the previous day, but Mr. Pacheco had been unavailable.

48.	Mr. Solano had previously worked with Mr. Pacheco and Mr. Machuca had seen Mr. Solano with Mr. Pacheco around Hunts Point.

49.	Mr. Montalvo told Mr. Solano that he had spoken with Mr. Pacheco

50.	Mr. Pacheco had not been paid for his work the day before because he had not been able to move the Container.

51.	Mr. Solano asked Mr. Montalvo if he thought the Container had drugs.

52.	Mr. Montalvo told him that he didn't believe the Container had drugs.

53.	Since Mr. Solano had to return his empty container to the Red Hook terminal, he agreed to pick up Mr. Machuca's container while he was at the terminal.

54.	Mr. Machuca agreed to pay Mr. Solano the going rate for driving a container from

Red Hook to Hunts Point, $600.00.

55. Mr. Solano asked what was in the Container, and Mr. Machuca told him dry coconuts, sour oranges, and peppers.

56. Mr. Solano entered the Red Hook terminal that afternoon and presented his credentials at the guard booth.

57. After dropping off his empty container, Mr. Solano proceeded to pick up the Container.

58. The Container appeared normal and its manifest indicated that it contained sour oranges, bell peppers and coconuts.

59. However, Mr. Solano noticed a suspicious car near his truck that he believed was some sort of surveillance.

60. Mr. Solano was correct in his suspicion.

61. Homeland Security Investigations had arranged themselves strategically throughout the terminal and the streets outside in dark-colored American-made sedans with tinted windows.

62. Concerned that he might be picking up a suspicious container with drugs, Mr. Solano called Officer Dalrymple to make sure that the Container was ok.

63. During the call, Mr. Solano told Officer Dalrymple many pertinent details:

    (a) The container number;

    (b) The Bronx Warehouse it was to be delivered;

    (c) The name of the importer-exporter who had arranged the delivery, Mr.

    Machuca; and,

  (d)  The driver who had turned down the job, Mr. Pacheco.

64. Mr. Solano asked Officer Dalrymple to check on the container to make sure that it was okay to be picked up.

65. Mr. Solano told Officer Dalrymple that he was suspicious of the Container, but he was not involved.

66. Officer Dalrymple promised to look into the Container and call him back.

67. While waiting to hear back from Officer Dalrymple, Mr. Solano left the terminal with the Container.

68. Officer Dalrymple called back when Mr. Solano was near the Manhattan Bridge.

69. During this call, Officer Dalrymple asked Mr. Solano for the names and phone numbers of the people involved in the transaction.

70. Mr. Solano provided the text message with the delivery address and Mr. Machuca's contact information and repeated that he had nothing to do with the Container.

71. Mr. Solano continued driving the Container towards the Bronx.

72. When Mr. Solano was in the East Village, Officer Dalrymple called back again.

73. To avoid disclosing the controlled delivery, Officer Dalrymple told Mr. Solano that the Container had been on hold for agriculture but was now okay to be picked up.

74. Mr. Solano continued to Hunts Point, where he dropped off the Container and left.

75. Shortly after leaving the Container, Homeland Security Investigation Officers stopped Mr. Solano's truck, arrested him and brought him to Homeland Security Investigations'

Manhattan Office.

76. Mr. Solano had committed no crimes and was unaware that drugs had been previously inside the Container.

77. Defendant Corvi and Special Agent Lennis Barrois ("Agent Barrois") interrogated Mr. Solano.

78. During the interrogation, Defendant Corvi and Agent Barrois asked for permission to search Mr. Solano's phone.

79. Mr. Solano agreed and signed the Consent to Search Form.

80. Mr. Solano was never read his Miranda Rights and never waived them.

81. Mr. Solano never admitted to knowing that the Container contained drugs.

82. Mr. Solano never admitted to knowingly transporting drugs.

83. After the first interrogation, Mr. Solano was placed in a holding cell.

84. Defendant Corvi conducted a second interrogation of Mr. Solano that same day.

85. Mr. Solano was still not read his Miranda Warnings.

86. Mr. Solano did not admit to any knowledge of transporting narcotics.

87. Mr. Solano did not have any knowledge that the Container had contained narcotics.

88. Mr. Solano never knowingly transported a Container containing narcotics.

89. Defendant Corvi falsely claimed that Mr. Solano was read his Miranda Warnings.

90. Defendant Corvi falsely claimed that Mr. Solano admitted to previously transporting two containers which contained drugs.

91. Defendant Corvi falsely claimed that Mr. Solano admitted to knowing that the Container contained drugs.

92. Defendant Corvi falsely claimed that Mr. Solano admitted that Mr. Montalvo warned him that there were narcotics in the Container.

93. Defendant Corvi forwarded this false information to the prosecutor's office.

94. Mr. Solano was charged with Conspiracy to Distribute Cocaine and Attempted Possession of Cocaine with Intent to Distribute.

95. Mr. Solano was held at the Brooklyn Detention Center until he posted $75,000.00 bail on June 10, 2016.

96. As a condition of his bail, Mr. Solano was required to:

   (a) Remain in the confines of New York City, Long Island or New Jersey;

   (b) Surrender his passport;

   (c) Report to Pretrial Services;

97. Mr. Solano's criminal trial commenced on November 14, 2017.

98. During the criminal trial, Defendant Corvi:

   (a) Falsely testified that during Defendant Corvi's first interview with him on June 7, 2016, Mr. Solano was read his Miranda rights from a card;

   (b) Falsely testified that also during that first interview, Mr. Solano waived his Miranda rights and agreed to speak with Defendant Corvi;

   (c) Falsely testified that someone asked Mr. Solano to sign the Miranda card indicating that Mr. Solano was aware of his rights and was willing to speak

  (d)  Falsely testified that during the second interview with him on June 7, 2016, Mr. Solano told Defendant Corvi that an individual named Javier told him to be careful with the load and that Mr. Solano took that to mean that there were narcotics inside of the Container;

  (e)  Falsely testified that during the second interview with him on June 7, 2016, Mr. Solano had admitted to previously picking up two containers which he knew had contained narcotics;

  (f)  Falsely testified that even though Defendant Corvi had not documented in his notes during the second interview with Mr. Solano, any mention of drugs, Mr. Solano had still told Defendant Corvi that he knew about the drugs;

99. At the conclusion of the trial, Mr. Solano was convicted of Attempted Possession of Cocaine, but found not guilty of the Conspiracy to Distribute and Possess Cocaine with Intent to Distribute.

100. On November 17, 2017, Mr. Solano was committed to the custody of the Attorney General for confinement in a correction facility pending sentencing.

101. On October 30, 2018, Mr. Solano was sentenced to 42 months of incarceration followed by two years of supervised release.

102. On November 2, 2018, Mr. Solano filed a notice of appeal.

103. On May 21, 2020, Mr. Solano was granted bail.

104. On October 1, 2020, the Second Circuit vacated Mr. Solano's judgment of conviction.

105. On February 10, 2022, the United States government moved to dismiss the superseding indictment against Mr. Solano in the interests of justice.

106. On February 22, 2022, all counts were dismissed in the interests of justice against Mr. Solano, after he had served approximately 2.5 years incarcerated.

107. At the time of his arrest, Plaintiff had two teenage daughters, who relied on him for both emotional and financial support.

108. Plaintiff's false arrest, malicious prosecution, and wrongful conviction took a significant toll on his daughters, both financially and emotionally.

109. Hearing and seeing the financial and emotional impact of his false arrest, malicious prosecution and wrongful conviction on his daughters' lives has caused emotional damages for Plaintiff both during the pendency of his case and continuing thereafter.

Plaintiff's Damages and Injuries

110. Plaintiff's injuries and damages include, but are not limited to his:

   (a) Wrongful arrest, prosecution, and conviction for attempting to possess with intent to distribute five kilograms or more of cocaine, and sentence of 42 months' imprisonment and two years' supervised release, as well as the approximately six years he was maliciously prosecuted;

   (b) Actual incarceration, prior to and following trial, totaling nearly 2.5 years;

   (c) Physical injuries and illness, including injuries suffered during assaults by other inmates;

   (d) Loss of the services, society, companionship, and consortium of his family and friends;

   (e) Past and future mental and emotional suffering;

   (f) Past and future loss or diminution of employment earnings in an amount to be determined;

(g) Other items of attendant damages.

## FIRST CAUSE OF ACTION
**(42 U.S.C. § 1983; Malicious Prosecution Under the Fourth, Fifth, and Fourteenth Amendments; Against Defendant Corvi)**

111. Plaintiff repeats and re-alleges each and every allegation contained the aforementioned paragraphs of this Complaint.

112. By virtue of the foregoing, Defendant Corvi is liable to Plaintiff for damages, pursuant to 42 U.S.C. § 1983, for knowingly, willfully, and maliciously causing Plaintiff to be seized, prosecuted, and deprived of his liberty without probable cause, in violation of his right to be free of unreasonable search and seizure pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, and to procedural due process pursuant to the Fifth and Fourteenth Amendments.

113. Defendant Corvi is also liable to Plaintiff under 42 U.S.C. § 1983 for knowingly, willfully, and maliciously depriving Plaintiff of his liberty, without probable cause, through outrageous conduct that shocks the conscience, in violation of Plaintiff's right to substantive due process pursuant to the Fifth and Fourteenth Amendments to the United States Constitution.

## SECOND CAUSE OF ACTION
**(42 U.S.C. § 1983; Denial of Due Process and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments; Against Defendant Corvi)**

114. Plaintiff repeats and realleges each and every allegation contained in the aforementioned paragraphs of this Complaint.

115. Defendant Corvi deliberately manufactured false evidence against Plaintiff,

including inculpatory statements purportedly made by Plaintiff.

116. Defendant Corvi provided the inculpatory statements purportedly made by Plaintiff to prosecutors.

117. Defendant Corvi did so knowing that such evidence was likely to be relied upon by the jury at trial, and in fact the evidence was relied upon by the jury, thereby proximately causing Plaintiff's conviction.

118. In addition, Defendant Corvi did so knowing such evidence was likely to be relied upon by the court that was responsible for setting or denying bail, by the prosecutor who decided whether to prosecute, and by the grand jury that decided whether to indict, and in fact the evidence was relied upon by these bodies, thereby proximately causing Plaintiff to be deprived of his liberty.

119. Further, Defendant Corvi, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and the due process and fair trial provisions of the Fifth, Sixth, and Fourteenth Amendments, had an absolute constitutional obligation to disclose to the prosecution, and to the defense, all evidence in their possession or knowledge which tended to favor Plaintiff, including, but not limited to, the manner in which he had manufactured inculpatory statements allegedly made by Plaintiff.

120. He knowingly, willfully, intentionally, recklessly, and/or negligently failed to disclose such evidence.

121. Defendant Corvi thereby violated Plaintiff's right to procedural and substantive due process and to a fair trial pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and are liable to Plaintiff for damages under 42 U.S.C. § 1983.

## THIRD CAUSE OF ACTION
### (Negligent Hiring, Training and Supervision Under State Law; Against Defendant THE CITY OF NEW YORK)

122. Plaintiff repeats and realleges each and every allegation contained in the aforementioned paragraphs of this Complaint.

123. By virtue of the foregoing, Defendant THE CITY OF NEW YORK is liable to Plaintiff because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants and/or employees employed by the NYPD with regard to their aforementioned duties.

## DAMAGES DEMAND

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a. For compensatory damages of not less than $4 million;

b. For punitive damages against the individual Defendant of $2 million;

c. For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. §1988 and to the inherent powers of this Court;

d. For pre-judgment interest as allowed by law; and

e. For such other and further relief as this Court may deem just and proper.

Dated: New York, New York
April 19, 2023

BRUSTEIN LAW PLLC

By: /s/
Evan Brustein, Esq.
299 Broadway, 17th Floor
New York, New York 10007
(212) 233-3900
evan@brusteinlaw.com

*ATTORNEYS FOR PLAINTIFF*